IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ESTATE OF HEIDI SUSAN SCHERRER
CAILLET-BOIS, et al.,

       Plaintiffs

       v.

HOSPITAL ESPAÑOL AUXILIO MUTUO
DE PUERTO RICO, INC., et al.

       Defendants

CIVIL NO.  09-1202 (JP)

## OPINION AND ORDER

Before the Court are Defendant Hospital Español Auxilio Mutuo de Puerto Rico, Inc.'s ("Hospital") motion for partial summary judgment (**No. 88**), Plaintiffs' opposition (No. 97), Defendant's reply (No. 127), and Plaintiffs' surreply (No. 109).  On March 2, 2009, Plaintiffs brought the present suit alleging that Defendant Hospital's intake procedure violated the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd because it failed to provide an adequate screening to Heidi Scherrer Caillet-Bois ("decedent" or "Scherrer").  Plaintiffs also alleged that the care given by the Defendant physicians constituted medical malpractice because it did not satisfy the minimum standards of care required of medical professionals.  For the reasons herein, Defendant's motion is **DENIED.**

CIVIL NO. 09-1202 (JP)          -2-

## I.    <u>MATERIAL FACTS NOT IN GENUINE ISSUE OR DISPUTE</u>

The following material facts ("ISC UMF") were deemed uncontested by all parties hereto at the December 15, 2009, Initial Scheduling Conference (No. 70).

1. Hospital Español Auxilio Mutuo de Puerto Rico, Inc. (the "Hospital") is a private not for profit corporation organized and existing under the laws of the Commonwealth of Puerto Rico.

2. The Hospital operates a hospital in Hato Rey known as Hospital Auxilio Mutuo.

3. Dr. Pedro Aponte-Muñiz ("Aponte") is a licensed internal medicine doctor who at the time of the facts alleged in the complaint had privileges at Hospital Auxilio Mutuo.

4. Dr. Rafael J. Pastrana-Laborde ("Pastrana") is a licensed gastroenterologist who at the time of the facts alleged in the complaint had privileges at Hospital Auxilio Mutuo.

5. Dr. Luis Rivera-Iguina ("Rivera-Iguina") is a licensed emergency medicine doctor who at the time of the facts alleged in the complaint had privileges at Hospital Auxilio Mutuo.

6. Dr. Pablo Laureano-Martí ("Laureano") is a licensed emergency medicine doctor who at the time of the facts alleged in the complaint had privileges at Hospital Auxilio Mutuo.

CIVIL NO. 09-1202 (JP)              -3-

7.   On February 17, 2008 on or about 9:00 p.m., Scherrer presented to Hospital Auxilio Mutuo with chest pain later confirmed to be an Acute Inferior Myocardial Infarction.

8.   At the time she came to the Hospital on February 17, 2008, Scherrer was a 41 years old female patient with a known history of hypothyroidism, Hodgkin's Lymphoma in "remission" and Depression.  She referred that she was using Syntroid 0.2 mg and Wellbutrin.

9.   The patient's vital signs upon arriving were Pressure: 139/83; Heart Rate: 117 bpm; Temp: 36 C; Resp: 18rpm; %SpO: 0; MAP: 101.6.

10.   The Hospital was informed since the "triage" of the coronary condition, among other medical conditions, of Scherrer as well as the medications being taken by her.

11.   At 8:50 p.m. Scherrer was evaluated by an emergency room physician, Rivera-Iguina who refers as chief complaints oppressive chest pain, shortness of breath, nausea and dizziness.

12.   The diagnosis of Rivera-Iguina was chest pain r/o "unstable angina" and ordered CBC, Chemistry INR, EKG and chest X-ray.

13.   Scherrer was connected to a cardiac monitor, given oxygen, blood samples and an EKG was performed.

CIVIL NO. 09-1202 (JP)          -4-

14.   On February 17, 2008, Scherrer underwent emergency cardiac catheterization that found a 100% in Right Coronary Artery (RCA) and Patent Left Anterior Descend (LAD) and Circumflex (CX) arteries, left ventricular ejection fraction (EF) was 55%.

15.   On February 17, 2008, Scherrer underwent emergency angioplasty to RCA that was successful.  RCA Artery Stenosis reduced from 100% to 0%, according to interventional cardiologist Dr. Lapetina's note.  She was stable and was started in medications.

16.   An echocardiogram performed on February 19, 2008 showed the following findings: LVEF = 56%, Sclerotic cusps, calcific right coronary cusp with decreased motion. AVA 0.7 cm2 by continuity equation.  Mitral valve inverted E\A flow, mild regurgitation.  The conclusions of such echocardiogram were as follows: 1.  Adequate left ventricular systolic function; estimate 56% ejection fraction; 2. Sclerotic, calcific aortic valve with marked decreased right coronary cusp motion and severe stenosis; estimated valve area of 0.7 cm2.  There is moderate aortic regurgitation; 3. Mild mitral regurgitation; 4. Adequate right ventricular contractility; 5.  No pericardial effusion.

CIVIL NO. 09-1202 (JP)          -5-

17.  Scherrer was started in Heparin drip on February 21, pursuant to telephone order by Dr. Rodríguez-Vilá. Prior to that she was ordered to continue with Ancef 1 gr. IV and Vancomicin 1 gr. IV.

18.  Ventilation Perfusion Scan, performed on February 22, 2008, produced impression of high probability for acute pulmonary embolism.

19.  Hematologist was consulted on February 22 at 8:00 a.m.

20.  On February 23, 2008 Heparin was discontinued and Lovenox 90 mg s/q bid was started one hour thereafter.

21.  Ancef and Vancomicin were discontinued on February 25, 2008.

22.  Scherrer was discharged home on March 4, 2008.

23.  Scherrer arrived again to the hospital on March 8, 2008 with a chief complaint of chest pain, which was categorized as urgency level three (3). The triage was performed at 6:53 p.m. She was evaluated by the emergency room physician, Rivera-Iguina, around 9:00 p.m.

24.  Consultation to Aponte was placed at 9:00 p.m.

25.  Aponte evaluated the patient in the morning of March 9, 2008.

26.  Aponte ordered Vistaryl 50 mg stat at 3:40 p.m.

27.  Scherrer died at Hospital Auxilio Mutuo on March 9, 2008.

CIVIL NO. 09-1202 (JP)          -6-

28.  The parties stipulate to the autopsy record, as well as
     pages 12, 14, 20, 24, 26-28, 32, and 47-48 of the medical
     record.  Said pages are incorporated by reference into the
     uncontested facts.

The following facts are deemed uncontested ("UMF") by the Court
because they were included in the motion for summary judgment and
opposition and were either agreed upon, or they were properly
supported by evidence and not genuinely opposed.

1.  Plaintiffs in this case do not claim any wrongdoing by the
    Hospital during the February 17 to March 4, 2008
    hospitalization of Scherrer.

2.  In fact, during the February 17 to March 4, 2008
    hospitalization of Scherrer, her clinical conditions were
    managed very well.

3.  On Friday March 7, 2008 Claudia Scherrer ("Claudia"), the
    patient's sister, called Aponte to inform about Scherrer's
    symptoms.

4.  Aponte told Claudia to pick up a prescription of Prevacid
    at his office, to purchase it and to administer it to
    Scherrer.  Aponte also told Claudia that he was on call
    during the weekend and that if the symptoms persisted he
    could be contacted.

5.  On March 8, 2008, Claudia tried in vain to communicate
    with Aponte on three occasions.  After those attempts,

CIVIL NO. 09-1202 (JP)          -7-

> Scherrer was taken to the Emergency Room of Hospital Auxilio Mutuo.

6. Claudia called Aponte several times because he was the physician in charge of her sister's condition after her March 4, 2008 discharge from Hospital Auxilio Mutuo.

7. The triage sheet refers that Aponte was identified as Scherrer's "primary physician" (in Spanish: "médico primario") and "private physician" (in Spanish: "médico de cabecera").

8. On March 2, 2009 the instant action was filed.

9. On December 1, 2009, Plaintiffs filed an Amended Complaint.

10. Plaintiffs are Manuel Rivera González ("Rivera") (Scherrer's widow), Pablo and Paola Rivera-Scherrer (both the minor children of Rivera and the deceased), Susana Caillet (mother of the deceased) and Verónica, Claudia, María and Fernando (siblings of the deceased).

11. In both the Complaint and the Amended Complaint Plaintiffs claim damages as a result of Scherrer's death.

12. Both the Complaint and the Amended Complaint are based, in part, on the alleged EMTALA violation of the appearing codefendant.

13. Federal Jurisdiction is invoked on two grounds: over all Plaintiffs pursuant to EMTALA and, with regards to

CIVIL NO. 09-1202 (JP)          -8-

plaintiffs Susana Caillet, Verónica Scherrer, Manuel Rivera, Pablo Rivera, Paola Rivera under diversity of citizenship pursuant to 28 U.S.C. § 1332.

14. With regards to the alleged EMTALA violation, Plaintiffs claimed that the Hospital's intake procedure violated EMTALA because Scherrer was improperly categorized as a lower priority patient than was appropriate under the circumstances.

15. Plaintiffs notified the expert reports of their two expert witnesses in this case: Dr. Jesús Casal ("Casal") and Dr. Norma Villanueva ("Villanueva").

16. Casal testified under oath that the faulty categorization by the nursing staff may have affected the outcome in this case.

17. The other expert announced by Plaintiffs, Villanueva, did testify under oath that she had an opinion as to the alleged EMTALA violations.

18. Villanueva testified that the Hospital did not follow its triage categories and chest pain protocols in this case.

19. Villanueva testified under oath that according to the triage categories, the patient could have been categorized as a category one or two of urgency, but not a three as she was classified.

CIVIL NO. 09-1202 (JP)          -9-

20.  With regards to the chest pain protocol, Villanueva testified under oath that it was not followed in this case.

21.  Villanueva testified under oath that those were the only two EMTALA violations identified by her.

22.  At the time the Complaint was filed, Plaintiff Claudia Scherrer was domiciled in Puerto Rico.

23.  At the time the Complaint was filed, Plaintiff María Scherrer was domiciled in Puerto Rico.

24.  At the time the Complaint was filed, Plaintiff Fernando Scherrer was domiciled in Puerto Rico.

25.  At the time the Complaint was filed, Plaintiff Manuel Rivera shared his household with his children, minor Plaintiffs Pablo and Paola Rivera.

26.  At the time the Complaint was filed, Plaintiff Veronica Scherrer was domiciled in the State of Florida.

27.  At the emergency room, there are protocols for classification of patients. Those pertain to the triage section of the emergency room. There are certain classifications like one, two, and three, one being reserved for the most severe case, two less severe, and three the less severe of the three. The categories are up to 4. Category 1 mentions chest pain and talks about acute infarct.

CIVIL NO. 09-1202 (JP)          -10-

28.   The urgency of the treatment of a patient at the Emergency
      Room depends on the triage classification.

29.   The classification of a patient is a very important thing
      that will determine the aggressiveness and the importance
      that you give to the evaluation of the treatment of the
      patient.

30.   When it refers to triage misclassification the mistake is
      timing and time cannot be corrected.

31.   A category number four pertains to the fast track section
      of the emergency room, which are things that are not
      really severe.

32.   Category 1 patients with complaints of chest situation of
      that particular patient and all the factors that are
      together, the triage person has to make a decision as to
      the classification, if it is a number one classification,
      if it is considered moderate to severe, at least.  And
      then, and in this case if it is a chest pain or a
      complaint, or something that suggests that, that chest
      pain is going on, then they put him in the center.  They
      are supposed to put the patient there immediately.

33.   Category 1 patients should be presented to the emergency
      ward physician immediately.

34.   People that are triaged with chest pains with a history of
      cardiovascular or coronary disease, have high pressure,

CIVIL NO. 09-1202 (JP)          -11-

and a previous myocardial infarction, have to be sent to the chest pain center and would have been classified as Category 1 level of urgency.

35. Scherrer was really a critical care patient.

36. Definitely, she was not a Category 3 patient.

37. According to Rivera-Iguina, Scherrer was a Category 1 patient according to triage protocol.

38. Scherrer should have been placed in a Category 1 classification.

39. Scherrer was classified as Category 3.

40. Scherrer could have been categorized as a level 1 patient because of her previous risk factors. But even if not, at least she should have been categorized as a level 2 where it states that the patient can be stable if presents chest pain, difficulty in breathing with stable vital signs.

41. Hospital Auxilio Mutuo departed from the protocols approved by it when the classification of Scherrer was made.

42. Hospital Auxilio Mutuo has triage and chest pain protocols that were not followed in this case.

43. Casal testified under oath about the importance of an adequate screening and stated that if you triage a patient incorrectly, the evaluation is going to be delayed.

CIVIL NO. 09-1202 (JP)            -12-

44.  Hospital Auxilio Mutuo's Emergency Room Chest Pain Center
     (CDP) protocols are approved by the Medical Executive
     Committee of Hospital Auxilio Mutuo.  The purpose of the
     CDP protocol is for the emergency room specialists to
     follow up a series of tests and actions.

45.  The CDP protocols are subdivided in four (4) categories:
     all patients; acute myocardial infarction; unstable
     angina/non stemi; and chest pain of probable cardiac
     origin.

46.  The Chest Pain Protocol is one that was approved by the
     hospital.

47.  The purpose of the chest pain protocol is for having the
     emergency specialists follow-up a series of test and
     actions.

48.  Every patient that goes to Hospital Auxilio Mutuo must be
     subjected to the same chest pain protocol and there should
     not be any deviations from the protocol, if he/she is in
     a critical care section.

49.  Once a patient had been given or had fallen under the care
     of those protocols, the doctors are supposed to comply
     with the requirements of the protocols as to laboratories
     and the administration of drugs and the taking of
     measurements.  These protocols are established so they are
     followed.

CIVIL NO. 09-1202 (JP)          -13-

50. Hospital Auxilio Mutuo's protocols have sections concerning consultations with primary physicians and cardiologists.

51. On a cardiac patient, it is the normal procedure to call a cardiologist if the primary care physician is not available.

52. If the primary physician says call the cardiologist or call this one cardiologist, then Hospital Auxilio Mutuo, calls the cardiologist as long as the patient has a head doctor. If it does not have a head doctor, the unattached physician from the internal medicine department is called and then Hospital Auxilio Mutuo can make the choice to call one of the cardiologists on staff.

53. Both the cardiologist and the primary care physician would be the specialist more likely to resolve problems concerning cardiac conditions.

54. The emergency room physicians at Hospital Auxilio Mutuo may call a cardiologist if the primary physician does not answer the consult within two (2) hours.

55. Dr. Wilfredo Rendón ("Rendón") does not know why a cardiologist was not consulted in this case.

56. He cannot tell whether one should have been consulted.

57. Laureano never consulted a cardiologist.

CIVIL NO. 09-1202 (JP)          -14-

58. Even though it says cardiology consult and primary
    physician consult, Rivera-Iguina, as an emergency room
    physician, would not do a cardiology consult directly, he
    would go to the primary physician.

59. If the patient has any complaints regarding gastric
    discomfort or lower chest discomfort, and is a patient
    with an important clinical history of heart disease,
    previous cancer, among others, a doctor has to rule out
    the worst diagnosis first.

60. Rivera-Iguina first observed Scherrer at 8:50 p.m. and
    made a differential diagnosis of "unstable angina".

61. In order to rule out an unstable angina diagnosis the
    protocol of track two should have been followed.  This
    protocol was not followed by the doctor that took over his
    shift.

62. That is the protocol that he would have followed with
    Scherrer; it was in Rivera-Iguina's order papers.

63. The Chest Pain Center Protocol for patients with suspected
    Unstable Angina as Scherrer requests than an EKG has to be
    performed "stat".

64. At the Emergency Room every order of a physician is a stat
    order, you do not need to put stat on it.

65. The first EKG performed on Scherrer was approximately an
    hour after her arrival to the Emergency Room.

CIVIL NO. 09-1202 (JP)          -15-

66. The chest pain protocol mandates the hospital to perform repeated EKG examinations or persistent pain, change in status or symptoms.  This was not done according to protocol.

67. The chest pain protocol establishes that if the patient has persistent pain, an EKG has to be repeated.

68. Laureano relieved Rivera-Iguina after he concluded his shift at approximately 10:00 p.m. on March 8, 2008.

69. The first time Laureano documented that he saw Scherrer was 11:30 p.m. on March 8, 2008.

70. Laureano took an hour and a half to follow up on Scherrer's condition.

71. The protocol to rule out unstable angina was not followed by the doctors that relieved Rivera-Iguina.

72. When Laureano first attended Scherrer, she was on the chest pain protocol and the unstable angina protocol.

73. Scherrer referred having continuous pain at 1:30 a.m. on March 9, 2008.

74. Laureano did not order an EKG, as called for by the protocol in case of continuous pain.

75. Laureano understands, as an Emergency Room physician, that once you do a test of cardiac enzymes and one EKG, then the patient has no cardiac problems.  That is why he did not do the EKG.

CIVIL NO. 09-1202 (JP)          -16-

76. Chest Pain protocol also calls for oximetry on line number six.  This requirement of the medical standard orders was not followed in this case until after Rivera-Iguina ordered it to be done, after seeing the patient.

77. The hospital delayed the X-ray's examination, which was done an hour and a half after triage.

78. Rivera-Iguina did not order any laboratories other than the ones he ordered to be done at 8:50 p.m.

79. Laureano does not know why the vital signs were not taken according to protocol.

80. Laureano reported on his evaluation of Scherrer that she ate crackers.

81. Scherrer was a patient that should not have eaten anything.  Laureano did not order that this patient should not be given anything to eat.  He did not put that on the record.

82. To let a patient eat while in the unstable angina protocol is against the protocol.

83. A patient complaining of chest pain at the Emergency Room of Hospital Auxilio Mutuo is not supposed to wait almost two (2) hours to be seen by the Emergency ward physician. It is quite a long time.

CIVIL NO. 09-1202 (JP)                    -17-

84.  Scherrer was presented to Rivera-Iguina at 8:50 p.m., after her arrival to the Emergency Room at 6:53 p.m.

85.  Rivera-Iguina placed a consult to Aponte, who was the primary doctor of Scherrer at 9:00 p.m. on March 8, 2008.

86.  One hour and half after Laureano started his shift, he talked with Aponte over the phone, and started to treat Scherrer for gastric problems.

87.  Scherrer received drugs for her alleged gastric pain for nine (9) hours, and she did not get better.

88.  From 11:30 p.m., until 6:00 a.m. there are no notes from Laureano-Martí in Scherrer's record as to how she was progressing.

89.  Aponte answered the consult at 9:00 a.m. the next morning, twelve (12) hours after he was consulted.

90.  According to Rivera-Iguina all consults from the emergency room of the Hospital Auxilio Mutuo are supposed to be answered within the next two (2) hours.

91.  According to Laureano, the standard operating procedure at the Hospital Auxilio Mutuo as to the time that the emergency physician should wait for the primary physician doctor to answer a consultation before he does something else is between 30 to 50 minutes.

92.  Finally, according to Rendon, Aponte should have presented himself within three (3) hours after Laureano's consult.

CIVIL NO. 09-1202 (JP)          -18-

93.  Rendón understands that a doctor cannot answer a consult telephonically.  To "answer" a consult, the doctor has to see the patient in person.

94.  If a consulting doctor does not answer the consultation within 30 to 50 minutes, if he does not answer, another call is placed.  If the consulting physician does not answer, you start calling all the doctors.

95.  According to the hospital's chest pain protocol, when a patient arrives at the hospital, who was released four (4) days before, who had suffered a myocardial infarct and had pulmonary embolism and goes to the Emergency Ward and is diagnosed with a rule-out for unstable angina, the hospital calls the physician who was in charge of the patient on her last admission to the hospital.  If that physician does not answer the phone or he does not comes to the Emergency Room, the hospital must call the Chief of the specialty department that the physician is in.

96.  Rivera-Iguina does not know why there was a deviation in the chest pain protocol in Scherrer's case.

97.  Dr. Manuel A. Quiles, the expert witness for Hospital Auxilio Mutuo, a cardiologist, admitted in his deposition that after ruling out a MI the next diagnosis to be considered would have been pulmonary embolism, prior to any rule out of dyspepsia.

CIVIL NO. 09-1202 (JP)            -19-

98.  The complaint was filed on March 2, 2009.

99.  Manuel Rivera Gonzalez ("Rivera") owns a car in Florida.

100. Rivera has a bank account with Bank of America in Florida.

101. Rivera owns a residence in Florida.

102. Rivera bought the house in Florida with his late wife, Scherrer.

103. Prior Scherrer's demise, their intention was to go and live there.

104. In 2008, Scherrer and Rivera were planning to move at some point to the United States.

105. Rivera has a voter ID in Florida issued since January 29, 2009.

106. Rivera has a Florida State drivers' license.

107. Rivera intentions are to move and reside in Florida with his kids.

108. Since 2008, Rivera is planning to move to Florida.

109. Rivera is waiting to do the declaration of heirs.

110. Rivera filed his tax returns for the year 2008 and the year 2009 in the United States.

111. Rivera received a Homestead Tax Property exemption for the year 2009 for his property located at 2364 Victoria Falls Drive, Florida.

112. Rivera claims the Orlando, Florida home to be his main home since 2008, when he filled out his tax returns there,

CIVIL NO. 09-1202 (JP)          -20-

which were sent in 2009 and that they were planning to
move there.

113. Rivera pays more than $20,000 a year in property taxes.
He has five properties in Florida; one of them is exempt.

114. Scherrer's husband was sick for twenty (20) years and she
always took care of him at her home.

115. Scherrer opened a bank account in Florida where her social
security benefits are deposited.

116. Scherrer has a Florida State driver license
number S660-780-32-515-0 that was issued on January 23,
2009.

117. Scherrer is registered to vote in the State of Florida
since January 23, 2009.

## II.  **LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT**

Summary judgment serves to assess the proof to determine if
there is a genuine need for trial.  Garside v. Osco Drug, Inc.,
895 F.2d 46, 50 (1st Cir. 1990).  Pursuant to Rule 56(c) of the
Federal Rules of Civil Procedure, summary judgment is appropriate
when "the record, including the pleadings, depositions, answers to
interrogatories, admissions on file, and affidavits, viewed in the
light most favorable to the nonmoving party, reveals no genuine issue
as to any material fact and the moving party is entitled to judgment
as a matter of law."  Fed. R. Civ. P. 56(c); see also
Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st Cir. 1999)

CIVIL NO. 09-1202 (JP)          -21-

(stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993); Canal Ins. Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. and Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989).

On a summary judgment motion, the movant bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L. Ed. 2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson,

CIVIL NO. 09-1202 (JP)            -22-

477 U.S. at 248, 106 S. Ct. at 2510; <u>Celotex</u>, 477 U.S. at 324, 106 S. Ct. at 2553; <u>Goldman</u>, 985 F.2d at 1116.

## III. <u>ANALYSIS</u>

Defendant argues that summary judgment is appropriate in this case because Plaintiffs lack a viable claim under EMTALA as Plaintiffs have failed to present evidence on the issue of causation, linking the alleged EMTALA violations to the damage suffered by the decedent.[1]  In addition, Defendant argues that Plaintiffs' state law medical malpractice claims should be dismissed for lack of jurisdiction because complete diversity of citizenship as required for jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) does not exist. The Court will now consider Defendant's arguments in turn.

### A.   <u>Plaintiffs' EMTALA Claims</u>

Plaintiffs allege that Defendant acted in violation of EMTALA because it did not provide Scherrer with an appropriate medical screening as required by EMTALA.

EMTALA is an "anti-dumping" statute which was enacted by Congress in response to concern about the increasing number of

---

1.   The Court notes that Defendant in its reply memorandum argues, for the first time, that EMTALA does not apply because the decedent was no longer an emergency room patient when she died.  Defendant argues that she was an inpatient, and inpatients are protected by state malpractice laws.  The Court will not consider this argument because Defendant is raising this argument for the first time in its reply.  This argument was never raised in its motion for summary judgment.  <u>See</u> <u>Wills v. Brown University</u>, 184 F.3d 20, 26 (1st Cir. 1999) (stating that "[r]eply briefs are to counter the appellee's arguments, not to offer new theories of error for the first time"); Rivera Concepcion v. Puerto Rico, 682 F. Supp. 2d 164, 169 (D.P.R. 2010) (finding that "[a]rguments raised for the first time in a reply memorandum will not be considered by [the] Court").

CIVIL NO. 09-1202 (JP)          -23-

reports that emergency rooms were refusing to accept or treat uninsured patients with emergency medical conditions.  Correa v. Hospital San Francisco, 69 F.3d 1184, 1189 (1st Cir. 1995) (internal citation omitted).  EMTALA was not intended to be a federal medical malpractice statute, but rather a federal law that provided a remedy for emergency care patients where state malpractice provisions fell short.  Correa, 69 F.3d at 1192; see Reynolds v. Maine Gen. Health, 218 F.3d 78, 83 (1st Cir. 2000).

The statute imposes two categories of obligations upon hospitals.  First, it requires that hospitals provide an appropriate medical screening to all individuals who come to the hospital's emergency room seeking assistance.  42 U.S.C. § 1395dd(a); Correa, 69 F.3d at 1190.  Second, EMTALA requires that if an emergency medical condition exists, the hospital must render the services that are necessary to stabilize the patient's condition, unless transferring the patient to another facility is medically indicated and can be accomplished with relative safety.  See 42 U.S.C. § 1395dd(b); Correa, 69 F.3d at 1190.

A plaintiff can bring a cause of action under either the screening or stabilization provisions of EMTALA, or both.  See Benítez-Rodríguez v. Hosp. Pavía Hato Rey, Inc., 588 F. Supp. 2d 210, 214 (D.P.R. 2008).  The United States Court of Appeals for the First Circuit has outlined a three-pronged standard to establish an EMTALA violation.  Correa, 69 F.3d at 1190.  In order to prevail on an

CIVIL NO. 09-1202 (JP)          -24-

EMTALA claim, a plaintiff must show that (1) the hospital is a participating hospital, covered by EMTALA, that operates an emergency department; (2) the plaintiff arrived at the facility seeking treatment; and (3) the hospital either (a) did not afford the patient an appropriate screening in order to determine if she had an emergency medical condition, or (b) bade farewell to the patient (whether by turning her away, discharging her, or improvidently transferring her) without first stabilizing the emergency medical condition.   Id. (citing Miller v. Med Ctr. of S.W. La., 22 F.3d 626, 628 (5th Cir. 1994); Stevison v. Enid Health Sys., Inc., 920 F.2d 710, 712 (10th Cir. 1990)).

The parties hereto do not contest the first two requirements. That is, Scherrer arrived at the emergency room of the Hospital, a participating EMTALA facility, seeking medical care.   Plaintiffs' claims turn on the third prong: whether the hospital failed to provide appropriate screening.

### 1. *Screening*

Although EMTALA does not define what appropriate medical screening entails, the case law has defined this duty as providing an examination "reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." Correa, 69 F.3d at 1192; see Guadalupe v. Negrón-Agosto, 299 F.3d 15, 20 (1st Cir. 2002).

CIVIL NO. 09-1202 (JP)          -25-

A plaintiff must show that the screening that he or she received failed to comply with the standard screening policy that the hospital "regularly follows for other patients presenting substantially similar conditions." Malavé Sastre v. Hospital Doctor's Ctr., 93 F. Supp. 2d 105, 109-10 (D.P.R. 2000) (Pieras, J.) (noting that "an 'appropriate' screening is properly determined not by reference to particular outcomes, but instead by reference to a hospital's standard screening procedures"); see Correa, 69 F.3d at 1192 ("[t]he essence of this requirement is that there be some screening, and that it be administered evenhandedly").

In this case, Plaintiffs have presented uncontested evidence that Defendant Hospital had established chest pain and triage protocols and that Defendant departed from those protocols when the classification of Scherrer was made (UMF Nos. 41, 42). Plaintiffs presented testimony that the decedent was improperly categorized as a lower priority patient than she should have been under the circumstances when she was admitted to the emergency room (UMF No. 19). Plaintiffs also presented testimony from experts that the classification of a patient is very important and that the classification will determine the "aggressiveness and the importance" given to the evaluation and treatment of a patient (UMF No. 29). According to Plaintiffs' expert witness, Villanueva, given the triage categories, the decedent could have been categorized as a category one or two of urgency, but not a three as she was categorized

CIVIL NO. 09-1202 (JP)          -26-

(UMF Nos. 35-40). Also, Defendant conceded that the classification of a patient is very important and that the urgency of the treatment of an emergency room patient depends on the triage classification (UMF Nos. 28-29). Plaintiffs provided evidence that Scherrer waited almost two hours before seeing an emergency room physician despite her prior medical history, which included having been released from the hospital just four days prior after suffering from a pulmonary embolism and a myocardial infarct (ISC UCF No. 23, UMF Nos. 83, 94).

In this case, Defendant Hospital while not directly admitting to the EMTALA violations in its motion for summary judgment, does not at any point deny that such violations occurred. In fact, Defendant's motion as to Plaintiff's EMTALA claim focuses solely on the issue of causation. Defendant cites to EMTALA's civil enforcement provision, which provides:

> Any individual who suffers personal harm as a **direct result** of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the State in which the hospital is located, and such equitable relief as is appropriate.

42 U.S.C. § 1395dd(2)(A) (emphasis added).

Defendant asserts that summary judgment is appropriate because neither one of Plaintiffs' expert witnesses establishes a direct causal connection between the alleged EMTALA violations and the eventual demise of the patient.

CIVIL NO. 09-1202 (JP)            -27-

     The First Circuit, however, rejected a similar argument in
Cruz-Quiepo v. Hospital Español Auxilio Mutuo, 417 F.3d 67, 70
(1st Cir. 2005).  In Cruz-Quiepo, Defendant Hospital Español Auxilio
Mutuo argued that Plaintiff could not succeed on his EMTALA claim
because he had not proved a causal relationship between the EMTALA
violation and the damages alleged.  Defendant argued that Plaintiff's
heart condition was caused by his inability to properly care for
himself by lowering his cholesterol and was not caused by the
hospital.   Id.   The First Circuit rejected this argument as a
"non-starter."  Id.  Specifically, the Court stated:

> Auxilio Mutuo also asserts that it is entitled to summary
> judgment on the ground that "there is no causal
> relation[ship] between the damages alleged and the
> purported EMTALA violation."  . . . Specifically, Auxilio
> Mutuo claims that Cruz's heart condition was attributable
> to his "inability to adequately care for his physical
> condition" by controlling his cholesterol and blood
> pressure, rather than any action or omission of the
> hospital.  This argument is a non-starter.  Hospitals
> generally do not cause the emergency conditions that they
> are called upon to stabilize under EMTALA.  That does not
> mean, however, that a hospital's failure to stabilize a
> condition bears no causal relationship to the damages
> suffered by a patient as a result of a deterioration in
> his condition that could have been avoided by
> stabilization.

The same logic applies in this case.  Hospitals do not generally
cause the emergency conditions that they are called upon to identify
during the initial screening process.  Needless to say, that does not
mean that a hospital's failure to appropriately screen a patient
bears no causal relationship to the damages suffered by a patient as

CIVIL NO. 09-1202 (JP)          -28-

a result of a deterioration in his or her condition that could have been avoided by an initial, appropriate screening. In this case, had the doctors followed its triage and chest pain protocols and provided Scherrer with an appropriate screening, they might have correctly and promptly identified her condition and treated her accordingly.

Plaintiffs have presented uncontested evidence that on Scherrer's admission to Defendant Hospital's emergency room, she was classified as a lower priority patient than she should have been – that because of her prior medical history and symptoms she should have been a Category 1 patient or at least a Category 2 patient instead of a Category 3 patient as she was classified (UMF Nos. 35-40). Moreover, according to the Hospital's protocols, Category 1 patients should be presented to the emergency ward physician immediately (UMF No. 33). Scherrer waited almost two hours before seeing the emergency room physician, Rivera-Iguina (ISC UCF No. 23, UMF No. 83). Also, one of Plaintiffs' expert witnesses, during her deposition, explained that the classification of a patient is a "very important thing that will determine the aggressivity" and the importance given to the evaluation and treatment of a patient. (Pl.'s Exh. 10, p. 107). Another one of Plaintiffs' expert witnesses also testified that once a patient is categorized as a three in the emergency room, this affects the interventions by the doctors and the decision of whether to call a cardiologist, and may "in a significant way" affect the outcome of the case (Def.'s Exh. 2, p. 123).

CIVIL NO. 09-1202 (JP)          -29-

On a motion for summary judgment, the role of the Court is not to weigh the evidence and determine the credibility of the witnesses. Determinations of credibility should be made by the jury.  See Correa, 69 F.3d at 1192.  Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs have presented sufficient evidence for a reasonable jury to conclude that Defendant violated EMTALA in failing to provide an appropriate screening to Scherrer and that Defendant's violations caused the alleged damages to decedent and to Plaintiffs.

**B.   Plaintiffs' State Law Claims**

Defendant also moves for the dismissal of Plaintiffs' state law medical malpractice claims on the ground that complete diversity of citizenship does not exist.  Notwithstanding the lack of complete diversity,[2] the Court will exercise supplemental jurisdiction over Plaintiffs' state law medical malpractice claims because Plaintiffs' federal law EMTALA claims are still appropriately before this Court. See Newman v. Burgin, 930 F.2d 955, 963 (1st Cir. 1991) ("[t]he power of a federal court to hear and determine state law claims in non-diversity cases depends upon the presence of at least one substantial federal claim in the lawsuit").

---

2.   Federal jurisdiction based on diversity of citizenship requires that the matter in controversy be between citizens of different states.  28 U.S.C. § 1332(a)(1).  Thus, in the case of multiple plaintiffs and defendants, if even one plaintiff is of the same state as one of the defendants, then there is not complete diversity of citizenship.  In this case, Plaintiffs have admitted that three of the Plaintiffs, Claudia Scherrer, Maria Scherrer and Fernando Scherrer, were domiciled in Puerto Rico at the time the complaint was filed (UMF Nos. 22, 23).  Thus, complete diversity of citizenship does not exist.

CIVIL NO. 09-1202 (JP)              -30-

## IV.   <u>CONCLUSION</u>

In conclusion, the Court **DENIES** Defendant's motion for partial summary judgment as to Plaintiffs' EMTALA claims and **DENIES** Defendant's motion requesting dismissal of Plaintiffs' state law claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of June, 2011.

<u>s/José Antonio Fusté</u>
JOSÉ ANTONIO FUSTÉ
UNITED STATES DISTRICT JUDGE
